TREG TAYLOR
ATTORNEY GENERAL

Jessica Moats Alloway
Christopher Orman
Assistant Attorneys General
Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK  99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email:  jessie.alloway@alaska.gov
            christopher.orman@alaska.gov

Attorneys for the State of Alaska

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF ALASKA,<br><br>550 West 7th Avenue, Suite 1700<br>Anchorage, AK 99501<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; BRYAN MERCIER, in his official capacity as Acting Assistant Secretary, Indian Affairs; KAREN HAWBECKER, in her official capacity as Acting Solicitor;<br><br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>SHARON M. AVERY, in her official capacity as Acting Chairwoman of the National Indian Gaming Commission;<br><br>90 K Street NE, Ste 200<br>Washington, D.C. 20002<br><br>NATIVE VILLAGE OF EKLUTNA.<br><br>26339 Eklutna Village Road | Civil Action No.:<br><br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**<br><br>**Jury Trial: No** |

Chugiak, AK 99567

*Defendants*.

## INTRODUCTION

1.      The State of Alaska challenges a series of administrative decisions by officials within the Department of the Interior and the National Indian Gaming Commission (NIGC) that authorized the Native Village of Eklutna (the Tribe) to conduct gaming under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 (IGRA), on a Native Allotment located in Alaska.

2.      The Native Allotment at issue is known as the Ondola Allotment (the Allotment) and is owned by members of the Tribe and is in the unincorporated community of Chugiak within the boundaries of the Municipality of Anchorage, Alaska.

3.      For over 30 years, the Department of the Interior took the position that federally recognized tribes in Alaska did not have territorial jurisdiction over Alaska Native Allotments, even allotments owned by a tribe's own members. This position was formalized in a 1993 Solicitor Opinion authored by then-Solicitor Thomas Sansonetti. *See* M-36975, "*Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers*," at 129 (January 11, 1993) ("[T]here is little or no basis for an Alaska village claiming *territorial* jurisdiction over an Alaska Native allotment." (emphasis in original)) [hereinafter Sansonetti Opinion].[1]

4.      In 2016, the Tribe asked Interior for a determination that the Ondola Allotment constitutes "Indian lands" as defined by IGRA and is eligible for gaming. *See Native Village of Eklutna v. U.S. Department of the Interior*, 2021 WL 4306110, at *1 (D.C. Sept. 22, 2021). The Tribe also requested that Interior approve the Tribe's lease of the land from the Allotment owners

---

[1]      Available at: https://www.doi.gov/sites/doi.gov/files/uploads/m-36975.pdf (accessed on February 3, 2025).

for the development and operation of a gaming project. *Id.* Separately, the Tribe asked Interior's Solicitor to modify or withdraw the Sansonetti Opinion.

5.      Interior denied the Tribe's requests and relied on the Sansonetti Opinion. *Id.*, at *2.

6.      The Tribe filed a complaint in this Court in 2019 to challenge Interior's decisions and its reliance on the Sansonetti Opinion. *Native Village of Eklutna v. U.S. Dep't of the Interior, et al.,* No. 1:19-cv-02388 (DLF); *see also Native Village of Eklutna v. U.S. Department of the Interior*, 2021 WL 4306110, at *2 (D.C. Sept. 22, 2021). The State of Alaska intervened as a defendant in that litigation.

7.      In 2021, this Court affirmed Interior's decisions and held the Sansonetti Opinion's interpretation of the relevant law was "correct." *See Native Village of Eklutna*, 2021 WL 4306110, at *5; *see also id.* at *4 ("The Sansonetti Opinion was valid in the first instance and remains so today."). Specifically, the Court held that the Ondola Allotment did not qualify as "Indian lands" under IGRA because the Tribe did not have territorial jurisdiction over the allotment. *Id.* at *4–10 (upholding Interior's Indian lands determination because it was not contrary to the law or arbitrary or capricious).

8.      In the prior litigation, Interior defended the Sansonetti Opinion. It argued that the Sansonetti Opinion was consistent with the plain language of the Alaska Native Allotment Act and did not rely on *Chevron* deference to support its interpretation.

9.      The Native Village of Eklutna did not appeal the district court's decision in *Native Village of Eklutna v. U.S. Dep't of the Interior, et al.,* No. 1:19-cv-02388 (DLF).

10.     Under a different presidential administration, Interior changed its interpretation of the law in 2024. It issued a new Solicitor Opinion, authored by then-Solicitor Robert T.

Anderson, that partially revoked the Sansonetti Opinion. *See* M-37079, "Partial Withdrawal of

Solicitor's Opinion M-36975, *Governmental Jurisdiction of Alaska Native Villages Over Land

and Nonmembers*, and Clarification of Tribal Jurisdiction Over Alaska Native Allotments."

[hereinafter the Anderson Opinion].[2] The Anderson Opinion asserted that Alaska tribes are

presumed to have territorial jurisdiction over Alaska Native allotments. Solicitor Anderson also

concluded that, because this Court relied on the Sansonetti Opinion and failed to properly

consider the Indian Reorganization Act's privileges and immunities clause, this Court's 2021

decision in *Native Village of Eklutna* was in error. [Anderson Opinion, at 16 ("For the purposes

of the current consideration, I conclude that the *Eklutna* court erred in both its reasoning and its

ultimate conclusion.")]

      11.    Relying on the Anderson Opinion, on July 18, 2024, Sharon M. Avery, Acting

Chairwoman of the National Indian Gaming Commission (NIGC) approved the Tribe's April 19,

2024, Gaming Ordinance to conduct Class II gaming activities.[3] Contrary to the decision upheld

by this Court concerning the Ondola Allotment, Acting Chairwoman Avery concluded the Tribe

possessed territorial jurisdiction over the same Ondola Allotment. Six months later, on January

16, 2025, then-Assistant Secretary Bryan Newland concluded the lands in question are gaming

eligible and approved a lease between the owners of the Native Allotment and the Tribe. The

State seeks reversal of these unlawful decisions pursuant to 5 U.S.C. § 706 and an injunction

precluding the Tribe from engaging in any gaming activity on the Odola Allotment.

---

[2]    Available at:  https://www.doi.gov/sites/default/files/documents/2024-02/m37079-partial-wd-m36975-and-clarification-trbl-jurisdiction-over-ak-native-allotments-2124.pdf (accessed on February 3, 2025).

[3]    Available at: https://www.nigc.gov/images/uploads/gamingordinances/20240718_Native_Village_of_Eklutna_Gam_Ord.pdf (accessed on February 3, 2025).

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331. This action challenges

three final agency actions and is brought under the Administrative Procedure Act, 5 U.S.C. §§

701–706. The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, authorizes the requested

declaratory and injunctive relief.

13.     The federal government waived its sovereign immunity for actions challenging

final agency actions. 5 U.S.C. § 702. Decisions made by the NIGC are final agency decisions

and reviewable under the Administrative Procedures Act. 25 U.S.C. § 2714.

14.     The State challenges three final agency actions under 5 U.S.C. § 704.

15.     An actual, justiciable controversy now exists between the State and the

defendants, and the requested relief is proper.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this action

is brought against an officer of an agency of the United States in his official capacity and against

a federal agency.

17.     This complaint is related to a complaint filed in the District of Alaska on

December 16, 2024. *See Brian Holl, et al. v. Sharon Avery and Native Village of Eklutna*, 3:24-

cv-0273. Because the issues raised by the State in this complaint are the same as the issues

resolved by this Court in *Native Village of Eklutna v. U.S. Dep't of the Interior, et al.,* No. 1:19-

cv-02388 (DLF), this Court should exercise its jurisdiction, and the District of Alaska should

defer to this Court. *See Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 627–28 (9th Cir.

1991) (discussing the discretionary "first to file" rule).

**PARTIES**

18.     Alaska is a sovereign state, with a compelling interest in maintaining its jurisdiction over its land. Alaska also maintains an interest in enforcing the terms of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601–1629h.

19.     Defendant Department of the Interior is an agency of the United States and is charged with primary supervision of Indian Affairs for the federal government.

20.     Defendant Bryan Mercier is currently exercising the delegated authority of the Assistant Secretary, Indian Affairs within the U.S. Department of the Interior and is being sued in his official capacity. The Assistant Secretary is the federal official with delegated authority to grant an application to take land into trust under the implementing regulations contained in 25 C.F.R. Part 151.

21.     Defendant Karen Hawbecker is currently exercising the delegated authority of the Solicitor for the Department of the Interior. She is being sued in her official capacity.

22.     Defendant Sharon M. Avery is the Acting Chairwoman of the National Indian Gaming Commission. She signed the NIGC decision and is being sued in her official capacity.

23.     Defendant Native Village of Eklutna is a federally recognized tribe under the Federally Recognized Indian Tribe List Act of November 2, 1994, 108 Stat. 4791, 89 Fed. Reg. 947 (January 8, 2024), and has passed a gaming ordinance to undertake Class II gaming on the Ondola Allotment.[4]

---

[4]     The Tribe is identified as the Eklutna Native Village on the most recent list of federally recognized tribes. However, as noted by the Assistant Secretary's decision approving the lease, "[t]he Lease and other relevant documents . . . refer to the Tribe as the Native Village of Eklutna." Like Interior, the State recognizes that both names designate the federally recognized Eklutna Native Village and will use the Native Village of Eklutna for consistency.

**STANDING**

24.     The Anderson Opinion concluded that primary jurisdiction over Native Allotments in Alaska presumptively rests with Alaska tribes and the federal government, not with the State and the federal government. [Anderson Opinion, at 2–3] This is a change in the federal agency's longstanding interpretation of the law. It is also contrary to this Court's decision in *Native Village of Eklutna v. U.S. Dep't of the Interior, et al.*, No. 1:19-cv-02388 (DLF). The loss of sovereignty over land within its jurisdiction is a legally protectible interest. *See Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 6 (D.D.C. 2008); *cf. Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*, 928 F.2d 1496, 1498 (9th Cir. 1991) (finding legal interest in a tribe's status as "the exclusive governing authority of the reservation").

25.     The State also has an interest in maintaining the terms of the settlement reached through ANCSA. Congress passed ANCSA in 1971 to settle claims of aboriginal title, to promote economic development, and "maxim[ize] participation by Natives in decisions affecting their rights and property . . . without establishing a reservation system or lengthy wardship or trusteeship." 43 U.S.C. § 1601(a) & (b). As consideration for this settlement, the State relinquished its land selection priorities under the Alaska Statehood Act and provided half of the monetary settlement ($500 million). *Id*. §§ 1605, 1608, 1610. ANCSA set up a system where Alaska tribes would not have a land base over which they exercised territorial jurisdiction. Instead, Congress intended for the State to maintain primary jurisdiction over land owned by Alaska tribes, Alaska Natives, and Alaska Native Corporations.

## LEGAL AND FACTUAL BACKGROUND

**I.     The General Allotment Act of 1887 and the Alaska Native Allotment Act of 1906**

26.     Congress passed the General Allotment Act in 1887; an Act that totaled three single spaced pages and contained eleven sections. 4 Stat. 388 (Feb. 8, 1887). The "effect of the [General Allotment Act] was to convert millions of acres of formerly tribal land into fee simple parcels, fully alienable and free of all charge or incumbrance whatsoever." *Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 328 (2008) (internal quotations omitted). To accomplish this goal, allotments of land were issued to those applicants who are "recognized member[s] of an Indian Tribe or [who are] entitled to be so recognized." 43 C.F.R. § 2531.1(a). Allotments were granted to Indian tribal members residing on or off reservation. General Allotment Act, 4 Stat. 388, §§ 2 & 4; *see also U.S. v. Nice*, 241 U.S. 591, 596 (1916). Nevertheless, because an allottee had to prove tribal affiliation to be awarded an allotment under the General Allotment Act, a tribal relationship existed for all allotments, even when conveyed to an applicant that never resided on a reservation.

27.     In 1906, Congress passed the Alaska Native Allotment Act. 34 Stat. 197 (1906), amended by 70 Stat. 954 (1956). The Alaska Native Allotment Act consisted of a single section and just one paragraph. It authorized the Secretary of the Interior to allot 160-acre parcels of land "in the district of Alaska to any Indian or Eskimo . . . who resides in and is native of said district, and who is the head of a family, or is twenty-one years of age." *Id*. An applicant had to prove use and occupancy of the land for at least five years to be eligible for an allotment. 70 Stat. 954. The Act also clarified that the allotment "shall be deemed the homestead of the allotee and his heirs in perpetuity." 34 Stat. 197.

28. The Alaska Native Allotment Act was materially different from the General Allotment Act. The Alaska Native Allotment Act did not require an applicant to be a member of or eligible to be a member of an Indian tribe. Further, the allotments were not carved out of reservation lands. The allotments under the Alaska Native Allotment Act were to that individual "allottee and his heirs" and tribal affiliation was not a consideration. *William Bouwens et al.,* 46 IBLA 366, 1980 WL 19585 (1980) ("Because the right to an allotment is personal to the applicant and is unrelated to aboriginal, tribal, or clan occupancy, to establish the applicant's right under the Act his or her own personal use and occupancy must be shown; ancestral use and occupancy cannot be tacked on to establish the right."); *Status of Alaskan Natives*, 53 I.D. 593, 602 (1932).[5]

29. The Bureau of Land Management estimates that "as of November 2022, over 17,000 [Native Allotments] have been conveyed to individual Alaska Natives and approximately 251 parcels remain to be processed."[6] Since the Alaska Native Allotment Act authorizes conveyances of 160 acres per allotee, up to 2.7 million acres in Alaska may be considered Native Allotment lands as of November 2022.

## II.    The Alaska Statehood Act and Alaska Native Claims Settlement Act

30. In 1958, Congress enacted the Alaska Statehood Act. *See* Pub. L. No. 85-508, 72 Stat. 339 (1958) (Statehood Act). "And because the new State would need property—to propel

---

[5]    Available at: https://thorpe.law.ou.edu/sol_opinions/p301-325.html#m-26915 (accessed on January 31, 2025).

[6]    BLM.gov, Alaska Native Allotment Act Entitlements; available at: https://www.blm.gov/programs/lands-and-realty/regional-information/alaska/land_transfer/ak-native-allotment-act#:~:text=Alaska%20Native%20Claims%20Settlement%20Act%20(ANCSA)%20of%201971&text=As%20of%20November%202022%2C%20over,parcels%20remain%20to%20be%20proc essed (accessed on January 31, 2025).

private industry and create a tax base—the Statehood Act" permitted Alaska to select 103 million acres of "'vacant, unappropriated, and unreserved'" federal land for state ownership. *Sturgeon v. Frost*, 587 U.S. 28, 34 (2019) (quoting Statehood Act, § 6(a)-(b)).

31.     In the 1960s, when the State began its land selections under the Statehood Act a conflict arose regarding the Alaska Natives' unresolved aboriginal land claims. The conflict eventually led the Interior Secretary in 1966 to impose a freeze on all further selections. Discovery of oil on the Arctic Slope heightened the dispute and the need for resolution. *See United States v. Atlantic Richfield Co.*, 435 F. Supp. 1009, 1016–18 (D. Alaska 1977), *aff'd*, 612 F.2d 1132 (9th Cir.), *cert. denied*, 449 U.S. 888 (1980).

32.     Congress, Alaska Natives, and the State negotiated for over four years to settle Alaska Native land claims.

33.     During this process, Alaska Natives—represented *en masse* by the Alaska Federation of Natives (AFN)—made clear that they "very vehemently" opposed any settlement based on the reservation concept. *Alaska Native Land Claims: Hearings on S. 2906 Before the Senate Comm. on Interior and Insular Affairs*, 90th Cong., 2d Sess. 89 (1968). They also opposed the concept—advanced by the Secretary of the Interior—that the federal government would hold the land in trust. *Id.* at 576. Instead, rather than "some modified form of reservation or paternalism," Alaska Natives urged Congress to adopt "a bold and imaginative approach which fully and finally resolves all claims, . . . and permits the Natives to improve themselves and their land and determine their own destiny." *Alaska Native Land Claims: Hearings on H.R. 13142 and H.R. 10193 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs*, 91st Cong., 1st Sess. 181 (1969).

34.    For its part, Congress's purpose aligned with that of the Alaska Federation of Natives. As reflected in the legislative history, "[a] major purpose of this Committee and the Congress is to avoid perpetuating in Alaska the reservation and the trustee system which has characterized the relationship of the Federal government to the Indian peoples in the contiguous 48 states." S. Rep. No. 92-405, at 108-109 (1971) (emphasis added). Congress wanted to avoid reservations and thus declined to grant large enclaves that could result in "remote, land locked reservations rather than viable open communities." *Id*. at 76-77.

35.    The third party to this settlement now known as ANCSA was the State of Alaska, which also agreed with the structure adopted by Congress and supported by AFN in large part because it would give finality to the State's sovereign jurisdictional reach by resolving all competing land claims at once.

36.    Congress passed ANCSA (the settlement) in 1971. "In no clearer fashion could Congress have departed from its traditional practice of setting aside Indian lands." *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 532 (1998). The Act extinguished the Alaska Natives' aboriginal claims, 43 U.S.C. § 1603, "[b]ut it granted the Natives much in return." *Sturgeon*, 587 U.S. at 35. In exchange, ANCSA authorized the transfer of $962.5 million and 44 million acres of land. 43 U.S.C. §§ 1605, 1611. Congress sought to effect this settlement by "maximiz[ing] participation by Natives in decisions affecting their rights and property . . . without creating a reservation system or lengthy wardship or trusteeship." *Id.* § 1601(b). Thus, it expressly revoked the few reserves/reservations that had been created in Alaska (save Metlakatla), *id.* § 1618(a), and provided for the creation of more than 200 state-chartered village and regional corporations, owned and operated by Natives as for-profit businesses subject to state law. *Id.* §§ 1606, 1607. It then conveyed the land to these business corporations in fee,

leaving it a freely alienable corporate asset. *Id.* §§ 1611, 1613. To encourage Native villages to adopt municipal governments under state law, Congress required the new ANCSA corporations to reconvey a portion of their land to the existing municipal government or, if none existed, to the State in trust until one was established. *Id.* § 1613(c)(3).

37.    ANCSA also revoked the Alaska Native Allotment Act of 1906. 43 U.S.C. § 1617. Consistent with ANCSA's language of not creating "a reservation system or lengthy wardship or trusteeship," ANCSA in no way suggests Alaska tribes have any connection, let alone jurisdiction, over an allotment granted to an individual allottee. *See id.*

38.    As consideration for the settlement, the State relinquished its land selection priorities under the Alaska Statehood Act and provided half of the monetary settlement ($500 million). 43 U.S.C. §§ 1605, 1608, 1610.

**III.    Post-ANCSA, Interior took the position that Alaska tribes lacked territorial jurisdiction.**

39.    In the wake of ANCSA, those responsible for governing Alaska reaffirmed the historical understanding that Indian country with territorial jurisdiction did not exist in the state. In 1978, seven years after ANCSA's passage, Thomas W. Fredericks, Associate Solicitor for Indian Affairs, rejected the Arctic Village and the Native Village of Venetie's petition to have Interior take their former reservation into trust to create Indian country. He concluded that, following Congress's directive in ANCSA, it would be an abuse of the Secretary's discretion to accept in trust the village communities' former reservation lands. Memorandum from Thomas W. Fredericks, Associate Solicitor for Indian Affairs, to Forrest Gerard, Assistant Secretary — Indian Affairs, "*Trust Land for the Natives of Venetie and Arctic Village,*" (Sep. 15, 1978). In 1980, Interior promulgated land-into-trust regulations that prohibited consideration of any trust acquisitions in Alaska, "except acquisitions for the Metlakatla Indian Community of the Annette

Island Reserve or its Members" ("Alaska Exception"). Final Rule, Land Acquisitions, 45 Fed.

Reg. 62034 (Sept. 18, 1980).

40.     Interior reaffirmed this position again in 1993 with the release of the 133-page

Sansonetti Opinion. Relevant here, Solicitor Sansonetti concluded that the Alaska Native

Allotment Act was materially different from the General Allotment Act:

> A number of facts . . . do distinguish Alaska Native allotments from
> most allotments in the contiguous 48. First, the statute does not
> make tribal membership a criteria for receiving an allotment,
> probably because in 1906, Congress was not considering the Alaska
> Native allotments in a tribal context. This makes Alaska Native
> allotments more like Indian homestead allotments, rather than those
> issued pursuant to the General Allotment Act or other tribe-specific
> allotment acts. Second, Alaska Native allotments were not carved
> out of any reservation. While we consider this factor insignificant
> for *federal* jurisdictional purposes, we believe it has at least some
> significance in determining questions of *tribal* authority. Third, the
> statute specifically provides that the allotment "shall be deemed the
> homestead of the allottee and his heirs." Again, while not a
> controlling factor as such, the language makes the Alaska Native
> Allotment Act appear more similar to a general Indian homestead
> act rather than a tribal or reservation related allotment act.

[Sansonetti Opinion, at 128-129 (footnotes omitted)]

Regarding jurisdiction over Alaska Native Allotments, Solicitor Sansonetti examined the

relevant statutes and circumstances and concluded that he was "not convinced that any specific

villages or groups can claim jurisdictional authority over allotment parcels." [Sansonetti

Opinion, at 129] He reasoned that, "particularly in the absence of a tribal territorial base (e.g., a

reservation), there [wa]s little or no basis for an Alaska village claiming territorial jurisdiction

over an Alaska Native allotment." [*Id.*, at 127–28].

41.     The Sansonetti Opinion controlled Interior's position on this issue for the next 31

years. Multiple courts have relied upon the Sansonetti Opinion's interpretation of Indian law in

Alaska. *Confederated Tribes of the Chehalis Rsrv. v. Mnuchin*, 976 F.3d 15, 18, 26 (D.C. Cir.

2020), *rev'd on other grounds*, 141 S. Ct. 2434 (2021); *Alaska ex re. Yukon Flats Sch. Dist. v. Native Village of Venetie Tribal Gov't*, 101 F.3d 1286, 1303 (9th Cir. 1996) (Fernandez, J., concurring), *rev'd on other grounds*, 522 U.S. 520 (1998); *Native Village of Venetie I.R.A. Council v. Alaska*, 1994 WL 730893, at *12 (D. Alaska Dec. 23, 1994).

## IV.     Post-ANCSA legislation affirms Alaska Natives' lack of territorial jurisdiction (save Metlakatla).

42.     In the 1980s, Congress considered several amendments to ANCSA that would have changed the status of tribal jurisdiction in Alaska. The Alaska Federation of Natives supported what became known as the "qualified transferee entity (QTE) option." Amendments to the Alaska Native Claims Settlement Act and the Alaska National Interest Lands Conservation Act and to Establish a Memorial in the District of Columbia: Hearings on S. 485, S. 1330, S. 2065, and S. 2370 Before the Subcomm. on Public Lands, Reserved Water and Resource Conservation of the Senate Comm. on Energy and Natural Resources, 99th Cong., 2d Sess. 165-66 (1986).[7] The "QTE Amendment" would have allowed ANCSA corporations to transfer land or assets to traditional councils or IRA tribal councils to be held in trust by the federal government. *Id*. The State opposed the amendment, arguing that such transfers would strengthen the claim that there was Indian country in Alaska and would contravene ANCSA's declaration of accomplishing a settlement without creating a reservation system or lengthy wardship or trusteeship. Marth Hirschfield, *The Alaska Native Claims Settlement Act: Tribal Sovereignty and Corporate Form*, 101 Yale L. Jrnl. 1331, 1343 (1992). Congress ultimately rejected the QTE amendment. *Id*. Instead, Congress adopted the settlement trust option—an option deemed more neutral because it allowed a Native corporation's land to be placed into trust under state law. 43

---

[7]     Available at: https://www.google.com/books/edition/Amendments_to_the_Alaska_Native_Claims_S/LdiYU9 kIQyUC?hl=en (accessed on February 3, 2025).

U.S.C. § 1629e; House Explanatory Statement to P.L. 100-241, 1987 U.S.C.C.A.N. 3299, 3307, 1987 WL 61520 (December 21, 1987). President Reagan signed the settlement trust option into law in 1988. 101 Stat. 1805 (February 3, 1988).

43.    In 1994, Congress amended the Indian Reorganization Act (IRA) to include a "privileges and immunities" clause. 25 U.S.C. § 5123(f). Under that provision, "Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination . . . [of any] Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes." *Id.* Congress added the clause to end the Bureau of Indian Affairs practice of classifying some tribes as "historic" and others as "created." Making Certain Technical Corrections to Various Federal Statutes Affecting Native Americans, Congressional Record S. 1654, 140 Cong. Rec. H3802-01, at *H2803, 1994 WL 200895 (May 23, 1994). This statutory amendment did not eliminate the statutory distinctions that Congress had previously created between tribes and did not amend or repeal ANCSA.

44.    After enacting the privileges and immunities clause, Congress continued to recognize that Alaska tribes were different. For instance, Congress exempted Alaska from the Indian Consolidation Act Amendments of 2000, Pub. Law. 106-462, § 220, 114 Stat. 1991 (November 7, 2000), and added a "rule of construction" codified at 25 U.S.C. § 2219(c) that expressly recognizes that, unlike Indian allotments in the Lower 48, Alaska tribes do not have territorial jurisdiction over Alaska Native Allotments. Specifically, the rule of construction reads:

> Nothing in this section shall be construed to constitute a ratification of any determination by any agency, instrumentality, or court of the United States that may support the assertion of tribal jurisdiction over allotment lands or interests in such land in Alaska.

25 U.S.C. § 2219(c).

## V.    Native Village of Eklutna sought federal approval to engage in Indian Gaming on the Ondola Allotment.

45.    The Ondola allotment is an 8.05 parcel of land issued to Olga Ondola in 1963

under the Alaska Native Allotment Act of 1906. The allotment was not granted to Olga Ondola

from a reservation; meaning the allotment was never "segregated from the public domain." *U.S.

v. Pelican*, 232 U.S. 442, 445 (1914). The Ondola allotment is located approximately five miles

from the Native Village of Eklutna's government offices, in Chugiak, Alaska, and twenty-two

miles northeast of Anchorage.

46.    In June 2016, the Tribe asked Interior to issue a decision on whether the Ondola

allotment constituted "Indian lands" under IGRA. *See Native Village of Eklutna*, 2021 WL

4306110, at *2. IGRA defines "Indian lands" as

> (A) all lands within the limits of any Indian reservation; and
> (B) any lands title to which is either held in trust by the United States
> for the benefit of any Indian tribe or individual or held by any Indian
> tribe or individual subject to restriction by the United States against
> alienation and over which an Indian tribe exercises governmental
> power.

25 U.S.C. § 2703(4).

47.    Later in 2016, the Tribe requested the Secretary of the Interior withdraw the

Sansonetti Opinion.

48.    On June 18, 2018, John Tahsuda, then-Acting Assistant Secretary of Interior,

denied the Indian lands determination and the request to withdraw the Sansonetti Opinion. He

concluded "that the Ondola allotment is not Indian lands under the Indian Gaming Regulatory

Act and thus is ineligible for an Indian gaming facility." In reaching his decision, Acting

Assistant Secretary Tahsuda relied on five factors upon which Interior had previously relied to

determine whether "there is a tribal nexus to the lands or a political relationship with the owners

of the lands." [Tahsuda Decision, at 12 (internal quotations omitted)] This five-factor test

considered: "(1) Tribal membership of the original allottees and their heirs; (2) proximity to an

existing Indian reservation; (3) allotment location relative to treaty-recognized hunting, fishing,

and gathering territories; (4) the provision of Tribal police and other services in the area; and (5)

acknowledgement by local governments of Tribal regulatory and enforcement authority at the

site." [*Id.*] Using these factors, Acting Assistant Secretary Tahsuda concluded the Tribe did not

have tribal jurisdiction over the Ondola allotment because "[t]he United States consistently

treated the site as part of the public domain," "ANCSA revoked all reservations in Alaska but

one not relevant here and extinguished all aboriginal claims to the land in the state," "the

Department never acted on proposals to establish an Indian reservation," and "the Tribe has not

demonstrated a clear or original nexus to the Ondola Allotment site." [Decision, at 17]

49.     More than a year later, the Native Village of Eklutna filed a complaint in this

Court challenging Acting Assistant Secretary Tahsuda's decision and his reliance on the

Sansonetti Opinion. *See Native Village of Eklutna*, 2021 WL 4306110, at *1. In particular, the

Tribe argued the Sansonetti Opinion was incorrect or had been superseded by later legislation,

specifically the 1994 privileges and immunities clause. *Id.*, at *4, *7. The Tribe also challenged

Tahsuda's decision and Interior's disapproval of the proposed lease as arbitrary and capricious.

*Id.*, at *10.

50.     The State of Alaska intervened.

51.     Interior defended the Sansonetti Opinion and the agency decision denying the

Indian lands determination.

52.     On September 22, 2021, this Court affirmed Interior's decisions. It held that the Sansonetti Opinion's "interpretation of the Alaska Native Allotment Act was correct" and that the opinion "correctly determined that the Alaska Native Claims Settlement Act largely controls in determining whether Alaska Native tribes exercise jurisdiction over Alaskan lands." *Native Village of Eklutna*, 2021 WL 4306110, at*5–6 (internal quotations omitted). The Court concluded that Acting Assistant Secretary Tahsuda appropriately applied the Sansonetti Opinion's analysis to the Ondola allotment and correctly determined that the allotment was not "Indian land" under IGRA. *Id.*, at *7–9.

53.     In reaching its decision, the Court rejected the Native Village of Eklutna's arguments that laws adopted after 1993 invalidated the Sansonetti Opinion. *Id.*, at *6–7. It held the privileges and immunities provision did not "invalidate the Sansonetti Opinion's legal reasoning," because although the clause sought to "prohibit[] disparate treatment between similarly situated recognized tribes," the clause only required Interior "apply the same legal rule in the same manner, not that Interior necessarily reach the same outcome." *Id.* (alteration in original) (internal quotation marks omitted). The Court rejected the Tribe's argument that the Sansonetti Opinion set out a new legal test and instead found the opinion "sets forth the starting point for applying the general legal test for Indian tribal territorial jurisdiction to the unique factual and legal circumstances in Alaska." *Id.*, at *7.

54.     Having concluded the Sansonetti Opinion was correct, this Court upheld Interior's application of the Sansonetti Opinion to the Ondola Allotment. *Id.*, at *9-10. It also rejected the Tribe's argument that Interior's disapproval of their proposed lease was arbitrary and capricious, stating that "[a] gaming lease can be approved only on Indian lands" and the "Indian lands determination was not flawed." *Id.*, at *10.

18

**VI.    The Anderson Opinion purports to change the law.**

55.    Two plus years after this Court affirmed Interior's decision that the Ondola

Allotment was not Indian lands—and with a new presidential administration in place—Solicitor

Anderson issued M-37079, titled "Partial Withdrawal of Solicitor's Opinion M-36975,

*Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers*, and

Clarification of Tribal Jurisdiction Over Alaska Native Allotments."

56.    The Anderson Opinion claimed the Sansonetti Opinion was wrong for three

reasons. The Sansonetti Opinion (1) mistakenly compared the Alaska Native Allotment Act to the

homestead act, *id*. at 9–10; (2) incorrectly found relevant the lack of reservations in Alaska, *id*. at

10–12; and (3) was inconsistent with subsequent congressional acts such as the privileges and

immunities clause, discussed above, and the reauthorization of the Violence Against Women's

Act (VAWA) in 2022, *id*. at 13–18.

57.    When Congress passed VAWA 2022, it also passed the Alaska Tribal Public

Safety Empowerment Act to extend the benefits of the 2013 legislation to Alaska tribes. Pub. L.

No. 117-103, subtit. B., §§ 811-13, 136 Stat. 49, 904-10 (2022). One of the purposes of the

Alaska-specific Act was to "empower Indian Tribes" to effectively respond to cases of domestic

violence and other related crimes "through the exercise of special Tribal criminal jurisdiction."

*Id.* § 811(b)(2). The Act recognized and affirmed Alaskan tribes' inherent authority over Indians

in their respective villages.[8] *Id.* § 813(a). It also granted and extended tribal authority over non-

Indians in two ways. First, it granted tribes civil jurisdiction to issue and enforce protection

orders against any person in matters arising within the village or otherwise within the authority

---

[8]    A "Village" is defined to mean the "Alaska Native Village Statistical Area covering all or
any portion of a Native village (as defined in [ANCSA]), and depicted on the applicable Tribal
Statistical Area Program Verification map of the Bureau of the Census." *Id.* § 812(7).

of the Indian tribe. *Id.* § 813(b). Second, it created a limited criminal jurisdiction for some tribes, based on the theory that tribes have authority over an Indian victim or an Indian perpetrator. *Id.* § 813(d). Congress did not use the term "Indian country" in creating this new tribal jurisdiction because of the lack of Indian country and territorial jurisdiction in Alaska. Rather, it granted Alaska tribes a limited form of territorial jurisdiction coterminous with their villages.

58.     But based on Anderson's reinterpretation of the law, he concluded that Alaska tribes have a "rebuttable presumption" of territorial jurisdiction over a Native Allotment. [Anderson Opinion, at 21–22] That presumption can be rebutted if there is "evidence that the allotment is owned by a non-tribal member" and "there is no clear nexus between the allotted lands and the tribe claiming jurisdiction." [*Id*. at 21] To the latter factor, Interior will look "to whether the allotment is in close geographic proximity to the 'tribal community,' which for purposes here, refers to either (1) the area surrounding a tribe's governmental headquarters; or (2) the lands customarily and traditionally used by tribal members for hunting, fishing, gathering, and other subsistence activities." [*Id*.]

59.     The Anderson Opinion created a seismic shift in Alaska in a few ways.

60.     Before February 1, 2024, it was understood that Alaska tribes had no jurisdiction over Alaska Native Allotments. Suddenly, after February 1, 2024, approximately 2.7 million acres of land in Alaska were presumptively under the jurisdiction of Alaska tribes and thus "Indian country" under 18 U.S.C. § 1151. Further, in the context of IGRA and the definition of "Indian lands," this meant that most Alaska Native Allotments will be eligible for Class II gaming if an Alaska tribe can show it "exercises governmental power" over the allotment. 25 U.S.C. § 2703(4)(B).

61.    The Anderson Opinion also restored aboriginal land claims in Alaska, contrary to ANCSA. *See* 43 U.S.C. § 1603(b) ("All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including any aboriginal hunting or fishing rights that may exist, are hereby extinguished."). By requiring parties to consider whether an allotment is near the "lands customarily and traditionally used by tribal members for hunting, fishing, gathering, and other subsistence activities" [Anderson Opinion, at 21], the Anderson Opinion requires parties to consider whether the land in question is located near a tribe's aboriginal lands.

## VII.    The Native Village of Eklutna renews its quest for gaming on the Ondola Allotment.

62.    Within two months of the issuance of the Anderson Opinion, the Tribe submitted an ordinance to NIGC to undertake Class II gaming on the Ondola allotment.

63.    On July 18, 2024, NIGC Acting Chairwoman Sharon Avery approved the Tribe's gaming ordinance. She relied on the Anderson Opinion to conclude the Tribe had jurisdiction over the allotment. On the question of whether the Tribe "exercises government power" over the allotment, Acting Chairwoman Avery admitted that "there is limited case law on the question of whether a tribe 'exercises governmental power' within the meaning of IGRA." [NIGC Decision, at 8.] She then reweighed the same evidence this Court previously considered insufficient to demonstrate governmental control over the Ondola Allotment and came to the opposite conclusion. *Compare Native Village of Eklutna*, 2021 WL 4306110, at * 9 *with* NIGC Decision, at 8.

64.    The week before President Trump's inauguration, on January 15, 2025, then-Assistant Secretary Bryan Newland approved the Tribe's lease of 6.37 acres of the allotment. He concluded, among other things, "that the Ondola Allotment is Indian lands, as defined by IGRA

and, thus, is eligible for gaming." He also approved the Tribe's business lease request because it met the statutory and regulatory requirements.

## FIRST CAUSE OF ACTION

65.    The State realleges paragraphs 1 through 64.

66.    Acting Chairwoman Avery's July 18, 2024, decision approving the Native Village of Eklutna's gaming ordinance and finding the Ondola allotment constitutes "Indian lands" under IGRA was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and/or otherwise contrary to the law in violation of the APA. *See* 5 U.S.C. § 706(2).

67.    Assistant Secretary Newland's January 16, 2025, decision approving the Native Village of Eklutna's lease of the Ondola allotment for Class II gaming was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and/or otherwise contrary to the law in violation of the APA. *See* 5 U.S.C. § 706(2).

68.    The parties litigated both whether the Ondola Allotment qualifies as "Indian land" under IGRA and the validity of the Sansonetti Opinion on this issue in *Native Village of Eklutna v. U.S. Dep't of the Interior, et al.*, No. 1:19-cv-02388 (DLF). This Court was a court of competent jurisdiction, and it was necessary for this Court to determine those issues to resolve that litigation. As such, the federal defendants are barred by collateral estoppel from relitigating those issues. *See McLaughlin v. Bradlee*, 803 F.2d 1197, 1201-02 (D.C. Cir. 1986) (discussing collateral estoppel); *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" (citing *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)); *United States v. Paulson*, 68 F.4th

528, 547 (9th Cir. 2023), *cert. denied* 144 S. Ct. 1030 (2024) (recognizing that judicial estoppel can apply to the federal government and stating the non-exclusive factors for consideration as (1) "[the] party's later position [is' clearly inconsistent with its earlier position"; (2) "the party has succeeded in persuading a court to accept an earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage if not estopped" (internal quotation marks omitted)).

69.    The Anderson Opinion, M-37079, "Partial Withdrawal of Solicitor's Opinion M-36975, *Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers*, and Clarification of Tribal Jurisdiction Over Alaska Native Allotments," was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and/or otherwise contrary to the law in violate of the APA. *See* 5 U.S.C. § 706(2). Moreover, federal district court decisions are binding on federal agencies and Solicitor Anderson had no authority to refuse to follow a federal court decision based on his own belief that the court erred in its reasoning and ultimate conclusion. *See* U.S. Const. article III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.").

## SECOND CAUSE OF ACTION

70.    The State realleges paragraphs 1 through 69.

71.    The parties litigated whether the Ondola Allotment qualifies as "Indian land" under IGRA and the validity of the Sansonetti Opinion on this issue in *Native Village of Eklutna v. U.S. Dep't of the Interior, et al.*, No. 1:19-cv-02388 (DLF). This Court was a court of competent jurisdiction, and it was necessary for this court to determine those issues to resolve

that litigation. As such, the Native Village of Eklutna is barred by collateral estoppel from relitigating those issues. *See McLaughlin v. Bradlee*, 803 F.2d 1197, 1201-02 (D.C. Cir. 1986).

### PRAYER FOR RELIEF

WHEREFORE, the State of Alaska respectfully requests that this Court enter a judgment providing the following relief.

A.    Declare that the federal defendants and the Native Village of Eklutna are barred by collateral estoppel and/or judicial estoppel from relitigating the issues resolved in *Native Village of Eklutna v. U.S. Dep't of the Interior, et al.*, No. 1:19-cv-02388 (DLF), and, as such, declare that the Department of the Interior's and the National Indian Gaming Commission's decisions were contrary to the law;

B.    Declare that the Department of the Interior's actions, as set forth above, were arbitrary and capricious, an abuse of discretion, and not in accordance with law and therefore a violation of the IGRA, ANCSA, the Alaska Native Allotment Act, and the APA;

C.    Declare that the National Indian Gaming Commission's decision, as set forth above, was arbitrary and capricious, an abuse of discretion, and not in accordance with law and therefore a violation of the IGRA, ANCSA, the Alaska Native Allotment Act, and the APA;

D.    Declare the Anderson Opinion, M-37079, "Partial Withdrawal of Solicitor's Opinion M-36975, *Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers*, and Clarification of Tribal Jurisdiction Over Alaska Native Allotments," was arbitrary and capricious, an abuse of discretion, and not in accordance with law;

E.    Vacate the National Indian Gaming Commission's decision approving Native Village of Eklutna's gaming ordinance and finding the Ondola allotment constitutes "Indian lands" under IGRA;

F.      Vacate the Department of the Interior's decision approving the lease of the Ondola allotment to the Native Village of Eklutna;

G.      Enjoin the Department of the Interior from applying the Anderson Opinion, M-37079, "Partial Withdrawal of Solicitor's Opinion M-36975, *Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers*, and Clarification of Tribal Jurisdiction Over Alaska Native Allotments";

H.      Enjoin the National Indian Gaming Commission and the Department of the Interior from granting gaming ordinances or approving leases for the purposes of gaming on any Native Allotment in Alaska;

I.      Award Alaska its costs, expenses, and reasonable attorneys' fees; and

J.      Grant Alaska such other and further relief as the Court may deem necessary and appropriate.

DATED this 4th day of February, 2025.

TREG TAYLOR
ATTORNEY GENERAL

By:     */s/ Jessica Moats Alloway*
        Jessica Moats Alloway
        Assistant Attorney General
        Alaska Bar No. 1205045
        Email: jessie.alloway@alaska.gov

By:     */s/ Christopher F. Orman*
        Christopher Orman
        Assistant Attorney General
        Alaska Bar No. 1011099
        Email: christopher.orman@alaska.gov

*Attorneys for the State of Alaska*