**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF ALASKA,<br><br>          *Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>          *Defendants*. | Civil Action No.: 1:25-cv-00330-PLF |

**STATE OF ALASKA'S MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

TREG TAYLOR
ATTORNEY GENERAL

Jessica Moats Alloway
Christopher Orman
Assistant Attorneys General
Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK  99501
Telephone: (907) 269-5232
Email:  jessie.alloway@alaska.gov
           christopher.orman@alaska.gov

Attorneys for the State of Alaska

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 7

BACKGROUND ........................................................................................................... 7

I.     State law allows limited gaming for charitable benefit. ........................................... 7

II.    The Indian Gaming Regulatory Act regulates gaming on "Indian lands," and
       Interior's longstanding position had been that Alaska Native Allotments were not
       "Indian lands." ................................................................................................. 10

III.   In 2021, this Court confirmed that the Sansonetti Opinion correctly held that
       Alaska tribes lack territorial jurisdiction over Alaska Native Allotments. ............. 15

IV.    With no notice to the State, former Solicitor Anderson reconsidered this Court's
       decision, found it unpersuasive, and issued an Opinion that reached the opposite
       conclusion. ...................................................................................................... 18

V.     With the Anderson Opinion in hand, federal agencies rushed during the last days
       of President Biden's administration to issue the other necessary approvals for
       Indian gaming to the Native Village of Eklutna. .................................................. 19

ARGUMENT ............................................................................................................. 21

I.     The State is likely to succeed on the merits. ......................................................... 22

II.    The State is likely to suffer irreparable harm in the absence of a preliminary
       injunction. ....................................................................................................... 27

III.   The balance of equities tip in the State's favor. .................................................... 28

IV.    An injunction serves the public interest. .............................................................. 29

CONCLUSION ........................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Aenergy, S.A. v. Republic of Angola,*
    123 F.4th 1351 (D.C. Cir. 2024) .......................................................................................23

*Alaska v. Native Village of Venetie Tribal Gov't,*
    101 F.3d 1286 (9th Cir. 1996) ...........................................................................................12

*Alaska v. Native Village of Venetie Tribal Gov't,*
    522 U.S. 520 (1998) ...........................................................................................12, 13, 14

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984) ..........................................................................................................16

*Edwards v. Aetna Life Ins. Co.,*
    690 F.3d 595 (6th Cir. 1982) ............................................................................................23

*Ito v. Copper River Native Ass'n,*
    547 P.3d 1003 (Alaska 2024) ...........................................................................................12

*John v. Baker,*
    982 P.2d 738 (Alaska 1999) ......................................................................................12, 14

*Kansas v. United States,*
    249 F.3d 1213 (10th Cir. 2001) ............................................................11, 26, 27, 28

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244 (2024) ......................................................................................................16

*Montana v. U.S.,*
    450 U.S. 544 (1981) ..........................................................................................................11

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) ..........................................................................................................22

*Rhode Island. v. Narragansett Indian Tribe,*
    19 F.3d 685 (1st Cir. 1994) ..............................................................................................11

*Runyon ex rel. B.R. v. Ass'n of Village Council Presidents,*
    84 P.3d 437 (Alaska 2004) ...............................................................................................11

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) .........................................................................................21

*State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska,*
    371 P.3d 255 (Alaska 2016) ......................................................................................12, 14

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ..........................................................................................................21

*United States v. Wheeler,*
    435 U.S. 313 (1978) ..........................................................................................................11

*U.S. v. Mazurie,*
    419 U.S. 544 (1975) ..........................................................................................................11

*Winter v. Nat. Res. Def. Council, Inc.*,
　　555 U.S. 7 (2008).................................................................................21

*Worcester v. Georgia*,
　　31 U.S. 515 (1832)...............................................................................11

*Yellen v. Confederated Tribes of the Chehalis Rsrv.*,
　　141 S. Ct. 2434 (2021).........................................................................17

**Unpublished Cases**

*Akiachak Native Cmty., Kenaitze Indian Tribe, IRA v. Dep't of the Interior*,
　　Case No. 1:96-cv-02302 (D.D.C.) .......................................................15

*Native Vill. of Barrow v. Nat'l Indian Gaming Comm'n*,
　　Case No. 1:99-cv-00886 (D.D.C.) .......................................................15

*Native Village of Eklutna v. U.S. Dep't of the Interior*,
　　2021 WL 4306110 (D.D.C. September 22, 2021) ....................... *passim*

**Constitutional Provision**

U.S. Const. article III, § 1 ...........................................................................21

**Federal Statutes**

25 U.S.C. § 2201.........................................................................................25

25 U.S.C. § 2219.........................................................................................25

25 U.S.C. § 2219(a).....................................................................................25

25 U.S.C. § 2219(c).....................................................................................26

25 U.S.C. § 2701 *et seq*.............................................................................10

25 U.S.C. § 2703(4)...............................................................................10, 16

25 U.S.C. § 2710(b).....................................................................................11

25 U.S.C. § 5123(g).....................................................................................17

**Alaska Statutes**

AS 05.15 ........................................................................................................7

AS 05.15.010 *et seq*....................................................................................8

AS 05.15.020(a)..............................................................................................8

AS 05.15.020–.120 ........................................................................................8

AS 05.15.030 ..................................................................................................9

AS 05.15.050 ..................................................................................................9

AS 05.15.060(a)(5) .........................................................................................9

AS 05.15.070 ..................................................................................................9

AS 05.15.105 .................................................................................................................9

AS 05.15.115 .................................................................................................................9

AS 05.15.122 .................................................................................................................9

AS 05.15.124 ...............................................................................................................10

AS 05.15.128 .................................................................................................................9

AS 05.15.150 ...............................................................................................................10

AS 05.15.150(b) ..........................................................................................................10

AS 05.15.150–.160 .......................................................................................................8

AS 05.15.160 ...............................................................................................................10

AS 05.15.180 .................................................................................................................8

AS 05.15.180(f) and (h) ...............................................................................................8

AS 05.15.181 .................................................................................................................9

AS 05.15.183 .................................................................................................................9

AS 05.15.185 .................................................................................................................9

AS 05.15.187 .................................................................................................................9

AS 05.15.188 .................................................................................................................9

AS 05.15.620–.625 .......................................................................................................9

AS 05.15.640 .................................................................................................................9

AS 05.15.690 .................................................................................................................8

AS 05.15.690(32) ........................................................................................................10

AS 05.15.690(39) ..........................................................................................................8

AS 05.15.690(49)(c)(i) .................................................................................................9

AS 05.15.695 .................................................................................................................8

AS 11.66.200–280 .........................................................................................................7

AS 11.66.280(3)(C) ......................................................................................................7

**Federal Regulation**

25 C.F.R. § 502.12 ......................................................................................................11

**Alaska Regulations**

15 AAC 160.010 *et seq.* ...............................................................................................8

15 AAC 160.010–.020 ..................................................................................................8

15 AAC 160.040–.050 ..................................................................................................9

15 AAC 160.100 ...........................................................................................................9

15 AAC 160.220 ...................................................................................................9

15 AAC 160.230–.250 ...........................................................................................9

15 AAC 160.250 ...................................................................................................9

15 AAC 160.340 ...................................................................................................9

15 AAC 160.370–.440 ...........................................................................................9

15 AAC 160.480 ................................................................................................8, 9

15 AAC 160.500 ...................................................................................................9

15 AAC 160.580 ...................................................................................................8

15 AAC 160.600 ...................................................................................................8

15 AAC 160.710 ...................................................................................................9

15 AAC 160.780 ...................................................................................................9

15 AAC 160.822 .................................................................................................10

15 AAC 160.934 ...................................................................................................9

15 AAC 160.945–.950 ...........................................................................................9

15 AAC 160.980 ...................................................................................................9

## Legislative History

58 Fed.Reg. 54,364, 54,365 ...............................................................................13

Alaska Tribal Public Safety Empowerment Act to extend certain benefits to Alaska tribes,
    Pub. L. No. 117-103, subtit. B., §§ 811-13, 136 Stat. 49, 904-10 (2022)...................19, 25

Indian Entities Recognized by and Eligible to Receive Services from the United States
    Bureau of Indian Affairs, 89 Fed. Reg. 99899, 99902-99903 (Dec. 11, 2024).................27

Indian Land Consolidation Act Amendments of 2000,
    Pub. Law. 106-465, 114 Stat. 1991 (November 7, 2000).....................................25

Federally Recognized Indian Tribe List Act of 1994,
    Pub. L. No. 103-454, § 103(4), (5), 108 Stat. 4791, 4791-92............................13

Violence Against Women Reauthorization Act of 2013 (VAWA 2013),
    Pub. L. No. 113-4, § 904, 127 Stat. 54 (2013)..........................................24

Violence Against Women Reauthorization Act of 2022 (VAWA 2022),
    Pub. L. No. 117-113, 136 Stat. 840..........................................18, 19, 24, 25

## Other Authorities

Jeff Landfield, *Native Village of Eklutna rushes to open Birchwood casino before Trump takes office*, The Alaska Landmine (January 17, 2025), available at:
https://alaskalandmine.com/landmines/native-village-of-eklutna-rushes-to-open-birchwood-casino-before-trump-takes-office/.............................................................20

## INTRODUCTION

The State of Alaska seeks a preliminary injunction, asking this Court to enforce a final order that it issued in 2021 while it resolves the State's claims in this litigation. *See Native Village of Eklutna v. U.S. Dep't of the Interior*, 2021 WL 4306110 (D.D.C. September 22, 2021). This request is necessary because Robert Anderson, the former Solicitor for the Department of the Interior, believed Interior was not bound by the Court's 2021 decision despite having been a party and having argued for the very position the Court ultimately adopted. As such, in February 2024, Anderson issued a Solicitor Opinion where he concluded that the Court had "erred in both its reasoning and its ultimate conclusion," [Exhibit A, at 16] and offered a new interpretation that allowed Interior to grant the Native Village of Eklutna (the Tribe or Eklutna) the very relief that this Court had denied only four years prior. The Tribe is now relying on those federal actions to offer class II gaming in a temporary facility on a Native Allotment in Alaska as it continues to build a permanent facility on the same property. Having intervened as a defendant in the prior litigation to protect its sovereign jurisdictional, regulatory, and taxing authority and having not been afforded any opportunity by Anderson to offer its views prior to his actions, the State filed this lawsuit. It asks that the Court grant its motion for preliminary injunction to maintain the status quo that has existed in Alaska for more than 30 years as the Court reviews the federal actions that led to this litigation.

## BACKGROUND

### I.    State law allows limited gaming for charitable benefit.

Gambling is generally illegal in Alaska, AS 11.66.200–280, with charitable gaming being a limited exception to that general rule, AS 11.66.280(3)(C) (exempting "activity authorized by the Department of Revenue under AS 05.15" from the definition of "gambling"), *see generally*

AS 05.15.010 *et seq.* (generally referred to as the Alaska Gaming Reform Act (AS 05.15.695)). Alaska's charitable gaming laws allow limited types of gaming for the benefit of Alaskan not-for-profit organizations.[1] AS 05.15.020(a) ("a municipality or qualified organization may conduct an activity permitted under this chapter"), AS 05.15.690(39) (defining "qualified organization"). Net proceeds of allowed games, after payment of prizes, taxes, and specific expenses, go to permitted not-for-profit entities within Alaska. AS 05.15.150–.160. Most of those entities are charitable and educational organizations, but they also include civic, religious and other types of organizations. [Exhibit B, at 3][2] Municipalities and villages can hold permits. [*Id.*] In 2023, the State collected over two-and-a-half million dollars in revenue from charitable gaming. [*Id.*, at 7] And permitted not-for-profit organizations received more than forty-six million dollars in revenue from charitable gaming. [*Id.*, at 5]

The State comprehensively regulates charitable gaming. *See generally* AS 05.15.010 *et seq.* and 15 AAC 160.010 *et seq.* It regulates the issuance of permits to qualified not-for-profit organizations, AS 05.15.020–.120, 15 AAC 160.010–.020; it regulates the games that can be played, AS 05.15.180; it regulates the maximum value of prizes, AS 05.15.180 (setting total annual prize limits generally), 15 AAC 160.480(a)(3) (setting prize limit for single pull tab at $500), 15 AAC 160.600 (setting annual prize limits for bingo); it regulates the frequency with which some games can be played, 15 AAC 160.580 (limiting bingo sessions per month, sessions per day, and games per session); it regulates who can play some games, AS 05.15.180(f) and (h)

---

[1]    Permitted games are listed in AS 05.15.180 and AS 05.15.690. They are primarily pull-tabs, bingo, raffles, and local competitions like salmon derbies and betting on when the ice will break up in the spring.

[2]    Alaska Department of Revenue Tax Division, "Charitable Gaming 2023 Annual Report" available online at https://tax.alaska.gov/programs/programs/reports/Annual/CharitableGaming/AnnualReport.aspx?Year=2023.

(bingo players must be 19 or older, Calcutta pool players must be 18 or older), AS 05.15.187

(pull-tabs players must be 21 or older), 15 AAC 160.710 (employees of the Department of Fish

and Game may not participate in salmon classics); it regulates serving alcohol in conjunction

with games, AS 05.15.690(49)(c)(i) (allowing a "vendor" of pull-tabs to be an establishment

holding a beverage dispensary license from the Alcoholic Beverage Control Board), 15 AAC

160.480(c) (prohibiting sale of pull-tabs to a drunken person); 15 AAC 160.500 (prohibiting

alcohol access where bingo is played); it regulates manufacturing and distribution of some

games, *see, e.g.* AS 05.15.181, AS 05.15.183, AS 05.15.185, 15 AAC 160.040–.050, 15 AAC

160.370–.440 (regulating the manufacturing and distribution of pull-tabs); it regulates operators

and vendors of games, AS 05.15.122, 15 AAC 160.230–.250; it regulates the relationship

between operators and vendors of games and permit holders, AS 05.15.115, 15 AAC 160.220

(governing operator contracts with permit holders); AS 05.15.188, 15 AAC 160.340 (governing

vendor contracts with permit holders); 15 AAC 160.250 (governing operator reports to permit

holders); 15 AAC 160.270 (governing operator payments to permit holders); and it regulates

advertising and promotion of games, AS 05.15.640, 15 AAC 160.780, 15 AAC 160.945–.950,

among other things. The State has the power to conduct background checks on certain key

individuals involved in charitable gaming, AS 05.15.060(a)(5), AS 05.15.105, 15 AAC 160.100,

15 AAC 160.934; to examine books and records of charitable gaming, AS 05.15.070, 15 AAC

160.980; inspect premises used for charitable gaming, 15 AAC 160.980; to issue subpoenas and

compel testimony, AS 05.15.070; and to suspend and revoke permits and licenses, AS 05.15.050,

AS 05.15.128. State law also gives important rights to municipalities, including the opportunity

to ban charitable gaming entirely within the municipality, AS 05.15.620–.625; the opportunity to

object to issuance of a specific permit within the municipality, AS 05.15.030; and the ability to

prohibit specific vendors or operators from engaging in charitable gaming within the municipality, AS 05.15.124.

But the centerpiece of the State's gaming law is the requirement that all net proceeds of permitted gaming be dedicated to charitable purposes. AS 05.15.150. Net proceeds are all revenues from charitable gaming after payment of limited, specific expenses. AS 05.15.690(32) (defining "net proceeds"), AS 05.15.160 (listing authorized expenses that a permit holder may deduct from "net proceeds"). Net proceeds cannot be saved or allowed to accrue; permit holders must spend all net proceeds from charitable gaming within one year of receipt. AS 05.15.150(b); 15 AAC 160.822.[3] This system implements the Alaska legislature's policy goal that gaming in Alaska benefit all Alaskans by redistributing profits for public benefit through permitted organizations.

## II. The Indian Gaming Regulatory Act regulates gaming on "Indian lands," and Interior's longstanding position had been that Alaska Native Allotments were not "Indian lands."

The Indian Gaming Regulatory Act (IGRA) regulates gambling conducted by "Indian Tribes" on "Indian lands." *See* 25 U.S.C. § 2701 *et seq*. "Indian lands" are defined as follows:

Indian lands means:
(A) all lands within the limits of any Indian reservation; and
(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4).

A regulation further explains "Indian lands" to mean:

(a) Land within the limits of an Indian reservation; or

---

[3]    A municipality or qualified organization may apply to the Department of Revenue for special permission to hold the net proceeds for longer than one year. AS 05.15.150(b); *see also* 15 AAC 160.822.

(b) Land over which an Indian tribe exercises governmental power and that is either—
(1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
(2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.

25 C.F.R. § 502.12.

Here, the Tribe seeks to conduct "class II" gaming on the "Ondola Allotment," an Alaska Native Allotment. IGRA states that "[a]n Indian tribe may engage in, or license and regulate, class II gaming on Indian lands *within such tribe's jurisdiction.*" 25 U.S.C. § 2710(b) (emphasis added). Thus, the analysis of whether a particular property is "Indian lands" under IGRA first determines whether a tribe has jurisdiction over the property and second determines whether the tribe exercises governmental power over the property through "concrete manifestations of authority." *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001) ("A proper analysis of whether the tract is 'Indian lands' under IGRA begins with the threshold question of the Tribe's jurisdiction"); *Rhode Island. v. Narragansett Indian Tribe*, 19 F.3d 685, 702–03 (1st Cir. 1994) ("In addition to having jurisdiction, a tribe must exercise governmental power in order to trigger the Gaming Act. Meeting this requirement does not depend upon the Tribe's theoretical authority, but upon the presence of concrete manifestations of that authority.").

There are two, separable, forms of tribal jurisdiction: jurisdiction over members and jurisdiction over land. *See, e.g, U.S. v. Mazurie*, 419 U.S. 544, 577 (1975) ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory") (citing *Worcester v. Georgia*, 31 U.S. 515 (1832)); *Montana v. U.S.,* 450 U.S. 544, 563 (1981) (same) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)). Only jurisdiction over land, or territorial jurisdiction, matters here. A tribe may have jurisdiction over its individual members even though it has no jurisdiction over any land. *See Runyon ex rel. B.R. v.*

11

*Ass'n of Village Council Presidents*, 84 P.3d 437, 439 (Alaska 2004) ("Although Alaska no longer contains Indian country, its Native villages retain those fundamental attributes of sovereignty . . . which have not been divested by Congress or by necessary implication of the tribe's dependent status.") (internal quotation marks omitted), *overruled on other grounds by Ito v. Copper River Native Ass'n*, 547 P.3d 1003 (Alaska 2024); *State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 371 P.3d 255, 267 (Alaska 2016) (tribal courts have "inherent, non-territorial" subject matter jurisdiction to adjudicate child support obligations of members). Federally recognized tribes may be sovereign entities although "severe[d] from the land" and "without territorial reach." *See Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 526 (1998) ("[the Alaska Native Claims Settlement Act] attempted to preserve Indian tribes, but simultaneously attempted to sever them from the land; it attempted to leave them as sovereign entities for some purposes, but as sovereigns without territorial reach") (quoting *Alaska v. Native Village of Venetie Tribal Gov't*, 101 F.3d 1286, 1303 (9th Cir. 1996) (Fernandez, J. concurring)). This is particularly common in Alaska due to its unique history. *See John v. Baker,* 982 P.2d 738, 754 (Alaska 1999) (stating, in a case of first impression, that "[b]ecause the traditional reservation-based structure of tribal life in most states forms the backdrop for the federal cases, courts have not had occasion to tease apart the ideas of land-based sovereignty and membership sovereignty."). The Tribe's jurisdiction over the individuals inhabiting the Ondola Allotment therefore does not answer the question of whether the Tribe has territorial jurisdiction over the Ondola Allotment.

In the early 1990s, twenty years post enactment of the Alaska Native Claims Settlement Act (ANCSA), the extent of tribal sovereignty, including tribal territorial jurisdiction, remained unresolved. The federal government requested guidance and commissioned Interior to research

and produce what became the Sansonetti Opinion, which was issued in 1993. [Exhibit C] The Sansonetti Opinion reached two major conclusions: (1) Tribes continue to exist as sovereigns in Alaska, but (2) they do not have territorial jurisdiction over ANCSA settlement lands. [Exhibit C, at 107–08]. The Opinion pointed to the unique nature of the Alaska Native Allotment Act and the general lack of tribal territorial jurisdiction post-ANCSA to conclude Alaska tribes generally do not have territorial jurisdiction over Alaska Native Allotments. [*Id.* at 127–28]. It also explained that "Congress ha[d] left virtually no room under ANCSA for Native villages in Alaska to exercise governmental power over lands." [*Id.* at 132]

In 1993, Interior formally acted on the Sansonetti Opinion's first conclusion and added Alaska tribes to the list of federally recognized tribes, which was formally ratified by Congress the following year. *See* 58 Fed.Reg. 54,364, 54,365 (describing the Sansonetti Opinion and stating, "in view of the foregoing … the Department of the Interior has determined it necessary to publish a new list of Alaska tribal entities"); Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103-454, § 103(4), (5), 108 Stat. 4791, 4791-92. This act was a recognition and validation of the Sansonetti Opinion. And in 1998, the Supreme Court vindicated the second conclusion of the Sansonetti Opinion by holding that Alaska tribes lack jurisdiction over ANCSA settlement lands. *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520 (1998).

In *Alaska v. Native Village of Venetie*, the Supreme Court held that ANCSA settlement lands are not subject to tribal jurisdiction based on reasoning largely consistent with the Sansonetti Opinion.[4] 522 U.S. 520 (1998). Like the Sansonetti Opinion, the Court directly interpreted ANCSA to reach its holding that the structure and Congressional intent of ANCSA

---

[4]     Note that, unlike Eklutna, Venetie was one of the few Alaska tribes to inhabit a reservation before ANCSA, and the land in question was former reservation land. 522 U.S. at 523.

precluded settlement lands from being considered "dependent Indian communities" for purposes of federal or tribal jurisdiction, even when owned by a tribe in fee. *Venetie,* 522 U.S. at 534; [Exhibit C, at 117–120]. However, *Venetie* left open the question of whether a tribe could have territorial jurisdiction over Alaska Native Allotments. *Venetie,* 522 U.S. at 528 & n. 2 ("Because ANCSA revoked the Venetie reservation, and because *no Indian allotments are at issue*, whether the Tribe's land is Indian country depends on whether it [is a] "dependent Indian communit[y]") (emphasis added). The allotment question was not before the Court so the Court did not address it. The following year, the Alaska Supreme Court held that ANCSA did not extinguish the non-territorial sovereignty of Alaska tribes over their own members. *John v. Baker*, 982 P.2d 738, 748–49 (Alaska 1999); *see also State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 371 P.3d 255, 267 (Alaska 2016) (tribal courts have inherent, non-territorial subject matter jurisdiction to adjudicate child support obligations of members).

Between 1993 and 2024, Interior consistently applied the conclusions reached in the Sansonetti Opinion. During this period, Interior denied at least three separate requests for an "Indian lands" determination on the Ondola Allotment under IGRA. Interior denied the Tribe's request in 1995 on grounds similar to the denial challenged in *Native Village of Eklutna*, 2021 WL 4306110: specifically, that the allotment was not "Indian lands" because the Tribe did not exercise governmental power over the allotment. [Exhibit D][5] The Tribe tried again in 2007, but withdrew its request after the State and the Alaska legislature opposed it. [Exhibit E, Exhibit F, Exhibit G (note that, although the withdrawal states that the request would be resubmitted, as far as the State is aware the request was not re-submitted)] The third attempt resulted in litigation,

---

[5]    Although this denial does not identify the Ondola allotment, there are no other allotments in the Eklutna area.

with this Court concluding in 2021 that "Sansonetti's interpretation of the Alaska Native Allotment Act was correct." *See Native Village of Eklutna*, 2021 WL 4306110, at *5.

The Native Village of Eklutna is not the only federally recognized tribe in Alaska that wants to engage in gaming under IGRA. In the late 1990s, the Native Village of Barrow, the Native Village of Akiachak, and the Kenaitze Indian Tribe requested IGRA "Indian lands" determinations for certain Alaska Native Allotments (and analytically similar Native townsite lots). [Exhibit H, Exhibit I, at 2, and Exhibit K] Interior denied those applications too, on grounds similar to the grounds challenged in *Native Village of Eklutna*, 2021 WL 4306110. [Exhibit H, at 1-2, Exhibit I, at 2] The tribes challenged those denials in this Court. *See Akiachak Native Cmty., Kenaitze Indian Tribe, IRA v. Dep't of the Interior*, Case No. 1:96-cv-02302 (D.D.C.); *Native Vill. of Barrow v. Nat'l Indian Gaming Comm'n*, Case No. 1:99-cv-00886 (D.D.C.). And, as it did in 2021, this Court upheld the denial of the Native Village of Barrow's application in 2001. [Exhibit J] The Native Village of Akiachak and the Kenaitze Indian Tribe subsequently dropped their requests. [Exhibit K, Exhibit L] The question of whether an Alaska Native Allotment may be considered "Indian lands" for IGRA purposes may have arisen in additional situations of which the State is not aware. But in sum, Interior has consistently held that Alaska Native Allotments are not "Indian lands" and thus are ineligible for IGRA gaming.

### III.    In 2021, this Court confirmed that the Sansonetti Opinion correctly held that Alaska tribes lack territorial jurisdiction over Alaska Native Allotments.

After Interior in 2018 denied the Tribe's *third* application for an Indian lands determination on the Ondola Allotment, the Tribe filed a complaint in this Court under the Administrative Procedure Act that same year. [*See* Exhibit M] It alleged, among other things, that Interior "failed to recognize that the Sansonetti opinion was based on a flawed analysis and ha[d] been superseded by important changes in law and policy." [*Id.*, at 21] It further alleged that

even if the Sansonetti Opinion was correct, Interior improperly applied the test to conclude the Tribe had not shown a sufficient "original tribal nexus" to the Ondola Allotment. [*Id.*, at 22] As relief, the Tribe asked the Court to "revers[e] the Department's negative Indian lands determination," "declar[e] that the Allotment constitute[s] 'Indian lands' within the meaning of 25 U.S.C. § 2703(4)," and issue an injunction that would require Interior "to approve the Tribe's proposed lease of the Ondola Allotment." [*Id.*, at 26]

Interior defended its decision and the Sansonetti Opinion. It argued that "[e]ach of the three conclusions that the Sansonetti Opinion drew from the 1906 [Alaska Native Allotment Act] [were] apparent in the statute's plain language." [Exhibit N, at 15] Nowhere in Interior's pleadings did it cite to the now overturned *Chevron* decision to argue the Court must defer to the agency's determination as reasonable. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). [*See* Exhibits N and O].

The State intervened as a defendant to protect "its sovereign jurisdictional, regulatory, and taxing authority." [Exhibit P, at 3] Like Interior, the State argued that the Court should "affirm Interior's decision as a correct interpretation of Congressional intent in the Alaska Native Allotment Act and ANCSA." [Exhibit Q, at 27]

This Court agreed with the State and Interior on the merits, concluding the Sansonetti Opinion was correct on the law. It recognized that because of "Alaska-specific federal statutes and the lack of treaties between Alaska Natives and the federal government," Alaska tribes "lack clearly defined territory subject to their jurisdiction. *Native Village of Eklutna*, 2021 WL 4306110, at *1. As such, when it comes to federal-Indian relations, the Court explained that

"'Alaska is often the exception, not the rule.'" *Id.* (quoting *Yellen v. Confederated Tribes of the Chehalis Rsrv.*, 141 S. Ct. 2434, 2438 (2021)).

The Court expressly rejected the Tribe's argument that the Sansonetti Opinion was incorrect either as a matter of first impression or based on intervening law or policy changes. It instead held that "[t]he Sansonetti Opinion was valid in the first instance and remains so today." *Id*, at *4; *see also id*, at *5 ("Sansonetti's interpretation of the Alaska Native Allotment Act was correct."), *id.* at *6 ("Sansonetti also correctly determined that the Alaska Native Claims Act 'largely controls in determining whether' Alaska Native tribes exercise jurisdiction over Alaskan lands." (quoting Exhibit C). It held that Congress's subsequent recognition that federally recognized tribes exist in Alaska "had no impact on the validity or applicability of the Sansonetti Opinion to the Tribe's claim." *Id.*, at *6–7. It also concluded that the "privileges-and-immunities" provision of the Indian Reorganization Act, *see* 25 U.S.C. § 5123(g), did not change the circumstances that existed in Alaska. The Court explained that the privileges-and-immunities clause did not require Interior to treat all tribes the same; rather it only required Interior to apply the same "general Indian lands test" to all tribes. *Id.*, at *7–8. But in applying that test, Interior also had to consider the "unique factual and legal circumstances [that exist] in Alaska," as Sansonetti had done. *Id.*; *see also id.* at *8 (concluding "Interior applied the correct legal standard when making the Ondola Allotment Indian lands determination").

This Court also held that Interior had correctly applied the Sansonetti Opinion when concluding the Tribe did not have a sufficient "tribal nexus" to the Ondola Allotment. It held that Interior properly distinguished its prior decisions regarding tribes in the Lower 48 by recognizing that, unlike those tribes, Eklutna does not have a reservation or "an existing source of Tribal territorial sovereignty." *Id.*, at *8. Moreover, Interior had not acted arbitrarily or capriciously

when it concluded the Tribe's evidence was insufficient to establish the required nexus. *Id.*, at *8–9. Such evidence included the Ondola family's tribal membership, the location of the allotment in proximity to the Tribe's traditional lands, and the allotment's inclusion in a now-revoked federal reserve. *Id.*, at *9. Last, the Court noted that Interior considered the services offered by the Tribe to its members and agreed with Interior's position that "there is a difference between jurisdiction over members and jurisdiction over land." *Id.*

The Court issued final judgement in favor of Interior and the State on September 22, 2021, and the Native Village of Eklutna did not appeal. [Exhibit R]

**IV.    With no notice to the State, former Solicitor Anderson reconsidered this Court's decision, found it unpersuasive, and issued an Opinion that reached the opposite conclusion.**

In February 2024, former Solicitor Anderson partially revoked the 31-year-old Sansonetti Opinion and issued his own opinion that announced Alaska tribes now have territorial jurisdiction over Alaska Native Allotments in most circumstances. [Exhibit A] In doing so, Anderson also declared that this Court's decision in *Native Village of Eklutna* had been wrongly decided. [Exhibit A, at 1–2, 15] Specifically, he disagreed with the Court's analysis of the privileges-and-immunities amendment, concluding "the *Eklutna* court erred in both its reasoning and its ultimate conclusion." [Exhibit A, at 16] Anderson believed that Congress must provide an "explicit statutory mandate" to treat different tribes differently and disagreed with the Court's conclusion that Congress had sufficiently provided such a mandate through the Alaska Native Allotment Act or the Alaska Native Claims Settlement Act. [See Exhibit A, at 16] He also declared that "none of the reasons cited by the [Sansonetti] Opinion for distinguishing Native Allotments from those in the lower 48 states [were] persuasive." [Exhibit A, at 20]

To further bolster his decision, Anderson also relied on the Violence Against Women Reauthorization Act of 2022 (VAWA 2022), Pub. L. No. 117-113, 136 Stat. 840. [Exhibit A, at

17–18] Within VAWA 2022, Congress passed the Alaska Tribal Public Safety Empowerment Act to extend certain benefits to Alaska tribes. Pub. L. No. 117-103, subtit. B., §§ 811-13, 136 Stat. 49, 904-10 (2022). One of the purposes of the Alaska-specific Act was to "empower Indian Tribes" to effectively respond to cases of domestic violence and other related crimes "through the exercise of special Tribal criminal jurisdiction." *Id.* § 811(b)(2). The Act recognized and affirmed Alaska tribes' inherent authority over Indians in their respective villages.[6] *Id.* § 813(a). It also granted and extended tribal authority over non-Indians in two ways. First, it granted tribes civil jurisdiction to issue and enforce protection orders against any person in matters arising within the village or otherwise within the authority of the Indian tribe. *Id.* § 813(b). Second, it created a limited criminal jurisdiction for some tribes, based on the theory that tribes have authority over an Indian victim or an Indian perpetrator. *Id.* § 813(d). Anderson believed VAWA 2022 undermined the Sansonetti Opinion because, as he put it, that Act "supplies a connection by recognizing Alaska Native Village Statistical Areas as tribal territorial bases from which tribes in Alaska can assert their inherent jurisdiction." [Exhibit A, at 18]

Prior to issuing his new Solicitor Opinion, Anderson did not contact the State of Alaska or ask for its views.

**V.    With the Anderson Opinion in hand, federal agencies rushed during the last days of President Biden's administration to issue the other necessary approvals for Indian gaming to the Native Village of Eklutna.**

The February 2024 Anderson Opinion was the first of many necessary steps to authorize gaming under IGRA on the Ondola Allotment. In April 2024, the Tribe asked the National Indian Gaming Commission (NIGC) to review and approve the Tribe's gaming ordinance to undertake

---

[6]    A "Village" is defined to mean the "Alaska Native Village Statistical Area covering all or any portion of a Native village (as defined in [ANCSA]), as depicted on the applicable Tribal Statistical Area Program Verification map of the Bureau of the Census." Pub. L. No. 117-113 § 812(7).

class II gaming on the Ondola Allotment. [Exhibit S, at 1] Two months later, in June 2024, Interior's Solicitor's Office issued a new analysis of the Ondola Allotment. [*Id.*] Like it did with the Anderson Opinion, Interior did not notify the State of its intent to reconsider its prior decision regarding the Ondola Allotment. A month after Anderson issued his Indian lands decision, the NIGC approved the Tribe's gaming ordinance. [*Id.*]

After the November 2024 election, Interior moved in earnest to grant the Tribe its remaining approvals. First, it issued a draft environmental assessment on December 20, 2024, giving the public only 17 days (including Holidays) to comment. [Final Environmental Assessment, at 1-1][7] After it received several requests for additional time, Interior extended the comment period by only three days, until January 9, 2025. [*Id.*] The then Assistant-Secretary signed the Finding of No Significant Impact on January 16, 2025, the Thursday before President Trump's inauguration. [*Id.*, at 16] That same day, he also signed the decision to approve the lease of the Ondola Allotment from the allotment's owners to the Tribe. [*See* Exhibit T] That decision relied heavily on Anderson's new Indian lands decision for the Ondola Allotment, which was based on Anderson's Solicitor Opinion. [*See* Exhibit T, at 4–5]

The Tribe began construction on January 17, 2025, and opened a temporary facility on January 20, 2025.[8] The State filed this litigation on February 4, 2025, and on February 28, 2025, officials within President Trump's administration announced that they were suspending for further review all Solicitor Opinions issued by former Solicitor Anderson. [Exhibit U]

---

[7]    Available https://eklutnaea.com/.
[8]    Jeff Landfield, *Native Village of Eklutna rushes to open Birchwood casino before Trump takes office - The Alaska Landmine*, January 17, 2025, available at: https://alaskalandmine.com/landmines/native-village-of-eklutna-rushes-to-open-birchwood-casino-before-trump-takes-office/

The State now asks that the Court issue a preliminary injunction and enjoin the Tribe from taking any action authorized by the Anderson Opinion, the Anderson Indian lands decision, the NIGC's approval of its gaming ordinance, or the Assistant-Secretary's approval of its lease. Ultimately, what the State asks is for this Court to maintain the status quo by enforcing its 2021 decision as it resolves the State's claims in this lawsuit.

## ARGUMENT

The way in which former Solicitor Anderson purported to overturn a decision of this Court, a decision the federal agency he represented advocated for, merits the "extraordinary remedy" of a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Not only was his authority to take such an action highly questionable, *see* U.S. Const. article III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish"), it upset the jurisdictional balance that Alaska had operated under for the last 30-plus years without even allowing the State of Alaska the opportunity to comment or provide input.

"The purpose of a preliminary injunction is [] to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As the requester, the State must make a clear showing that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction serves the public interest. *Winter*, 555 U.S. at 20. The State can meet its burden, in large part, by pointing to this Court's 2021 ruling in favor of the State. *See Native Village of Eklutna*, 2021 WL 4306110.

I.       **The State is likely to succeed on the merits.**

The D.C. Circuit has held "that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011). This does not require a showing that that the moving party will *actually* succeed on the merits only that it will *likely* succeed. *See id.* at 398 (concluding plaintiffs failed to meet showing because "they have not shown they are more likely than not to succeed on the merits"). The State can easily meet that burden here.

This Court already ruled in the State's favor on the same legal arguments on the same allotment. *See Native Village of Eklutna*, 2021 WL 4306110. The Court held that the "Sansonetti Opinion was valid in the first instance and remains so today." *Id.*, at *4. The Tribe did not appeal that decision. Each of the approvals on which the Tribe relies to begin construction of its casino are based on the validity of the Anderson Opinion, which opted not to follow this Court's decision. [Exhibit A, at 22 ("This partial withdrawal is based on the finding that the portions [of the Sansonetti Opinion] were then, and remain, unsupported.")]; *but see Native Village of Eklutna*, 2021 WL 4306110, at *4 ("The Sansonetti Opinion was valid in the first instance and remains so today."). The only question that remains is whether the Tribe or Interior has any authority to ignore and/or challenge this Court's prior decision.

The Court should exercise its discretion and hold that Interior is judicially estopped from challenging its 2021 decision. Judicial estoppel generally prevents a party from taking a position in a legal proceeding that is inconsistent with a position taken in a previous proceeding, to protect the integrity of the judicial process. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). It is an equitable doctrine that can be invoked by a court at its discretion. Under this doctrine, a court considers (1) whether the party's later position is "clearly inconsistent with its earlier

position," (2) whether "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled,'" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750 (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.3d 595, 599 (6th Cir. 1982)).

Each factor tips in the State's favor such that this Court should exercise its discretion to invoke judicial estoppel. First, the position taken by former Solicitor Anderson is clearly inconsistent with the position Interior took in the earlier litigation. Second, Interior succeeded in persuading this Court that the Sansonetti Opinion was correct. *See Native Village of Eklutna*, 2021 WL 4306110, at *5. Should the Court now rule otherwise, there would be a clear perception that either today's Court or the Court in 2021 was misled. Third, allowing Interior to assert an inconsistent position would allow it to impose an unfair advantage on the State. The State intervened and defended Interior's position in the prior litigation; it would have done the same on appeal had the Tribe chosen to appeal. Interior's new position was developed behind closed doors without any involvement from the State. It has now put the State in the position of filing new litigation to defend a court decision that it previously thought was final.

Collateral estoppel, a different equitable doctrine, similarly bars the Tribe from challenging the Court's 2021 decision. As applied here, it would mean the Court's resolution of the validity of the Sansonetti Opinion in 2021 conclusively establishes that question in this lawsuit. *See Aenergy, S.A. v. Republic of Angola*, 123 F.4th 1351, 1356 (D.C. Cir. 2024) (stating that "the determination of a question directly involved in one action is conclusive as to that question in a second suit" (internal quotation marks omitted)). As the party invoking the doctrine,

the State must establish (1) that the same issue must have been contested by the parties and submitted for judicial determination in the prior case; (2) the issue must have been actually and necessarily determined by a court of competent jurisdiction; and (3) preclusion in the second case must not work a basic unfairness to the party bound by the first determination. *Id.*

The State can establish each of the elements of collateral estoppel as against the Tribe. First, it is the same legal issue: was the Sansonetti Opinion correctly decided? Second, this Court actually and necessarily decided the issue in its 2021 decision. [*See* Exhibit M, at 21 (The Tribe alleged that by "relying on the Sansonetti Opinion as the foundation of its analysis, the Department failed to recognize that the Sansonetti opinion was based on a flawed analysis and has been superseded by important changes in law and policy.")]; *Native Village of Eklutna*, 2021 WL 4306110, at *4 ("The Sansonetti Opinion was valid in the first instance and remains so today."); *id.* at *5 ("Sansonetti's interpretation of the Alaska Native Allotment Act was correct."). Third, it is not unfair to bind the Tribe to the first determination. The Tribe brought the previous lawsuit to resolve this very same legal question. It also chose not to exercise its right to appeal this Court's decision.

In response to the State's arguments, Interior or the Tribe may argue that the Court's decision was somehow undermined by VAWA 2022. That is simply inaccurate. In 2022, Congress took action to extend certain benefits available to Lower 48 tribes to Alaska tribes. The Violence Against Women Reauthorization Act of 2013 (VAWA 2013) included a historic provision that recognized the inherent authority of "participating Tribes" to exercise "special domestic violence criminal jurisdiction" over certain defendants, regardless of their Indian status, who commit acts of domestic violence or dating violence in Indian country. Pub. L. No. 113-4, § 904, 127 Stat. 54 (2013). This had little impact in Alaska, however, because VAWA applied

only in Indian country, of which Alaska has little. In VAWA 2022, Congress passed Alaska-specific legislation to extend the "special criminal jurisdiction" provision of VAWA 2013 to Alaska tribes. Congress's solution was not to create Indian country, grant Alaska tribes' territorial jurisdiction, or even recognize that Alaska Tribes have jurisdiction over Alaska Native Allotments, but rather to provide Alaska tribes with a limited form of village-based jurisdiction over non-Indians. *See* Pub. L. No. 117-103, subtit. B., §§ 811-13. In sum, through VAWA 2022, Congress continued to recognize how ANCSA and the lack of a reservation system in Alaska made Alaska different.

Anderson also mistakenly concluded that this Court had erred in its analysis of the privileges and immunities clause. [Exhibit A, at 13–16] Anderson relied on the Indian Reorganization Act to conclude that the agency must "insist[] on clear statutory directives to justify disparate treatment of otherwise similarly situated tribes." [Exhibit A, at 15] Even assuming that to be true (it is not), and that neither the Alaska Native Allotment Act nor ANCSA provided that clear statutory directive (though they did), Congress provided *another* "clear statutory directive" when it passed the Indian Land Consolidation Act Amendments of 2000. Pub. Law. 106-465, 114 Stat. 1991 (November 7, 2000). Through that Act, which Congress enacted *after* the privileges and immunities amendment of 1994, Congress sought to prevent the further fractionation of trust allotments made to Indians. *Id.*, § 102 (Note to 25 U.S.C. § 2201). To do so, it enacted a system that encouraged the consolidation of fractional interests in a manner that enhanced tribal sovereignty, promoted tribal self-sufficiency and self-determination and reversed the effects of the allotment policy on Indian tribes. *Id.* But, as it did with so many other statutory schemes in this area, Congress provided clear direction that Alaska shall be treated differently. *See* 25 U.S.C. § 2219 (Application to Alaska).

Relevant here, Congress expressly exempted Alaska from application of the Indian Land Consolidation Act Amendments. *Id.* It reasoned that although numerous academic and governmental organizations had studied fractioned ownership of Indian lands outside Alaska, the same type of work had not occurred for ownership in Alaska. 25 U.S.C. § 2219(a). Without yet knowing whether there was even a problem, Congress excluded Alaska from application of the amendments.

But in exempting Alaska from the Act, Congress also took pains to ensure that nothing it did could be construed as Alaska tribes having tribal territorial jurisdiction over Native Allotments in Alaska. It enacted a "rule of construction," found in 25 U.S.C. § 2219(c), that is the "clear statutory directive" that Interior now says it requires. This provision is an express recognition by Congress that tribes did not hold tribal territorial jurisdiction over allotment lands in Alaska and a clear statement that Congress sought to maintain that status quo. *Id.* § 2219(c). Specifically, the provision reads:

> Nothing in this section shall be construed to constitute a ratification of any determination by any agency, instrumentality, or court of the United States that may support the assertion of tribal jurisdiction over allotment lands or interests in such land in Alaska.

*Id.*

So, even after Congress amended the Indian Reorganization Act in 1994 to include the privileges and immunities clause, Congress still recognized that Alaska was unique and that Alaska tribes did not exercise territorial jurisdiction over lands like Lower 48 tribes. Nowhere in the Anderson Opinion is the Indian Land Consolidation Act (25 U.S.C. § 2219(c)) cited or discussed.

II.    **The State is likely to suffer irreparable harm in the absence of a preliminary injunction.**

The Anderson Opinion impacted Alaska by purporting to transfer territorial jurisdiction from the State to its federally recognized tribes. This led to a series of other federal actions that have harmed the State including the Indian lands decision, the NIGC decision approving the gaming ordinance, and the Assistant-Secretary's decision approving the lease. This harm is no different than that suffered by the State of Kansas in *Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001), where the Tenth Circuit found the State had sufficiently shown irreparable harm, *id.* at 1127.[9] Like the Tribe here, the Miami Tribe of Oklahoma sought an Indian lands determination from Interior for a "restricted Indian allotment." *Id.* at 1128. That parcel was in Kansas, and also like here, there was previous litigation over this issue for the very same tract. *Id.* at 1218–20. After multiple rounds of litigation, the NIGC ruled in the Miami Tribe's favor and concluded the Tribe exercised governmental power over the tract. *Id.* at 1220. The State of Kansas, like the State of Alaska, filed suit under the Administrative Procedure Act and sought a preliminary injunction. *Id.*

In affirming the district court's decision to grant Kansas's request for preliminary relief, the Tenth Circuit had "little difficulty" finding the State would suffer irreparable harm. *Id.* at 1227. The Court recognized that the NIGC's Indian lands determination "ha[d] a direct and immediate impact on the sovereign rights which the Miami Tribe, the Federal Government, and the State of Kansas exercise[d] over the tract." *Id.* at 1223. And, because the "State of Kansas

---

[9]    The harm to Alaska is actually greater than the harm to Kansas. Kansas has four federally recognized tribes and Alaska has 229. Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 89 Fed. Reg. 99899, 99902-99903 (Dec. 11, 2024) (Native Entities Within the State of Alaska Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs). Of the 229 tribes in Alaska, nearly all lacked any territorial jurisdiction prior to the Anderson Opinion.

claim[ed] that the NIGC's decision place[d] its sovereign interests and public policies at stake, [the court] deem[ed] the harm the State st[ood] to suffer as irreparable if deprived of those interests without first having a full and fair opportunity to be heard on the merits." *Id.* at 1227.

This situation is no different than that confronted by the Tenth Circuit. For over 30 years the Federal Government took the position that Alaska tribes did not have territorial jurisdiction over Native Allotments. That changed in February 2024 through a Solicitor Opinion that the State had no opportunity to participate in. Now, the Native Village of Eklutna is not only exercising territorial jurisdiction over this parcel, but it is also engaging in for-profit, non-taxable class II gaming on this property contrary to Alaska law. Like the State of Kansas, Alaska's "interests in adjudicating the applicability of IGRA, and the ramifications of such adjudication, are sufficient to establish the real likelihood of irreparable harm if the [d]efendants' gaming plans go forward at this stage of the litigation." *See id.* at 1228.

## III.    The balance of equities tip in the State's favor.

The Tenth Circuit's decision in *Kansas* is also helpful when analyzing the equities in this case. As the court there recognized, the answer to the Indian lands question "w[ould] affect the sovereign rights and regulatory powers of all involved." *Id.* at 1228. So, even though the court acknowledged the Miami Tribe's interest in beginning gaming and "reaping its economic benefits" as soon as possible, the court also acknowledged that the Tribe could proceed with its plans "*only if*" the lands qualified as Indian lands. *Id.* As such, the threatened injury to Kansas outweighed any harm the preliminary injunction might cause to the Government. *Id.*

The same holds even more true here. Not only does the State of Alaska have the same interests as Kansas, but it also already litigated these very same issues to resolution in 2021. To the extent the Tribe believed there was any urgency in building this class II gaming facility, had

it appealed the decision in 2021, it would have received an answer by now from the court of appeals, if not the Supreme Court. Having decided to forego its appeal, the Tribe cannot now allege any harm by being required to wait while this Court resolves the State's claims in this case.[10]

## IV.    An injunction serves the public interest.

The Anderson Opinion greatly upset the settled status quo in Alaska. Native Allotments exist throughout the state, and this opinion created randomly located pockets of tribal authority and immediately resulted in confusion regarding which sovereign is responsible for providing services and regulating them. It also upset settled expectations regarding the role of IGRA in Alaska. Interior has uniformly rejected "Indian lands" requests for Alaska Native Allotments going back to the mid-1990s at least. [Exhibits D, E, F, G, H, I and J] The rationale of those denials had been consistent with the rationale of the Court's 2021 decision, which upheld the Sansonetti Opinion. [*Ibid.*] By allowing the Tribe to move forward here, the Court could reopen these long-resolved matters.

This analysis does not change even though Interior has now decided to suspend the Anderson Opinion for further review. [*See* Exhibit U] Allowing one tribe to move forward based on unlawfully issued approvals hurts the public interest by allowing Interior to treat similarly situated Alaska tribes differently. As discussed above, Eklutna is not the only tribe in Alaska that has sought approval in the past to engage in class II gaming on an Alaska Native Allotment.

---

[10]    The Tribe may rely on its current operating and construction costs to attempt to show harm. Given this Court's 2021 decision, the Tribe had to have known that the federal decisions on which it relies came with substantial litigation risk. And it would likely allege much greater harm if it were allowed to proceed, and the State ultimately prevailed on its claims.

**CONCLUSION**

The Court should preliminarily enjoin the parties from taking any action authorized by the NIGC's approval of Eklutna's gaming ordinance or the Assistant-Secretary's approval of the lease, which were both based on the unlawful Anderson Opinion.

DATED April 9, 2025.

TREG TAYLOR
ATTORNEY GENERAL

By:    */s/ Jessica Moats Alloway*
Jessica Moats Alloway
Assistant Attorney General
Alaska Bar No. 1205045
Email: jessie.alloway@alaska.gov

By:    */s/ Christopher F. Orman*
Christopher Orman
Assistant Attorney General
Alaska Bar No. 1011099
Email: christopher.orman@alaska.gov

*Attorneys for the State of Alaska*

**Table of Exhibits**

Exhibit A – Anderson Opinion

Exhibit B – 2023 Charitable Gaming Annual Report

Exhibit C – Sansonetti Opinion

Exhibit D – 1995 Interior Memo re Eklutna request for Indian lands determination

Exhibit E – 2007 SOA Memo re Eklutna Indians lands determination re Ondola Allotment

Exhibit F – 2007 NIGC Decision re Eklutna Gaming Ordinance

Exhibit G – 2007 Letter from Eklutna withdrawing proposal

Exhibit H – 1995 Barrow Request

Exhibit I – Solicitor Memo re Akiachak Native Community Request

Exhibit J – 2001 Court Decision denying Barrow

Exhibit K – NIGC 2004 Order re Kenaitze Indian Tribe gaming ordinance

Exhibit L – NIGC 2004 Order re Akiachak Native Community gaming ordinance

Exhibit M- Eklutna's 2018 Complaint

Exhibit N – Interior's Cross-Motion

Exhibit O – Interior's Reply

Exhibit P – SOA Motion to Intervene

Exhibit Q – SOA Cross Motion

Exhibit R – Final Judgment

Exhibit S – NIGC Decision on Eklutna's Gaming Ordinance

Exhibit T – Assistant-Secretary's Lease Decision

Exhibit U – M Opinion Suspension Review